UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JENNIFER LYNN MOTHERSHEAD,

Petitioner,

v.

DEBORAH JO WOFFORD,

Respondent.

CASE NO. 3:21-cv-05186-MJP-JRC

REPORT AND RECOMMENDATION

NOTED FOR:  December 31, 2021

The District Court has referred this petition for a writ of habeas corpus under 28 U.S.C. § 2254 to Chief United States Magistrate Judge J. Richard Creatura, as authorized by 28 U.S.C. § 636(b)(1)(A)–(B) and local Magistrate Judge Rules MJR3 and MJR4.

On October 4, 2013, a jury found petitioner guilty of first-degree assault of her 13-month-old child (hereinafter "KM"), occurring in 2011. Dkt. 11-1, at 2, 16. The State's theory of the case was that petitioner put bleach into KM's eyes over approximately seven weeks (*see* Dkt. 11-1, at 2), including contaminating KM's eye medication, which caused permanent damage to KM's eyes. The State relied on circumstantial evidence, primarily scientific and witness

1    testimony, including testimony from five laboratory analysts supporting the conclusion that

2    petitioner had contaminated the eyedrops with bleach.

3        Petitioner, who is represented by counsel, challenges the constitutionality of her

4    conviction by presenting six grounds for relief.  Petitioner's initial ground for relief concerns the

5    admitted failures of petitioner's trial and collateral review counsel to adequately investigate and

6    develop the record by not submitting the full opinions of a toxicologist, Richard C. Pleus, M.D.,

7    or retaining him as a defense witness.  Dr. Pleus states that he had offered preliminary opinions

8    to petitioner's trial counsel and that he could have provided important evidence casting doubt on

9    plaintiff's guilt, but that until now, he had never been requested to complete his work.

10       Dr. Pleus' full affidavit has now been presented for the first time with this habeas

11   petition.  Trial counsel states that she failed to secure funding or to retain Dr. Pleus to complete

12   his work because she misunderstood the significance of Dr. Pleus' preliminary opinions.  She

13   now concedes that this was a mistake.  Petitioner's collateral review counsel also says that due to

14   her lack of experience representing criminal defendants in personal restraint petition ("PRP")

15   proceedings, she misunderstood the rules that would have allowed her to submit additional

16   information concerning Dr. Pleus' opinions to the state court.  So, again, Dr. Pleus' full opinions

17   were not developed or submitted to the state courts to substantiate the petitioner's argument that

18   trial counsel rendered ineffective assistance.  Not surprisingly, the state courts who considered

19   petitioner's PRP rejected the claim based on lack of substantiation.

20       The state court's denial of the PRP because the claim was not substantiated is considered

21   a procedural default.  Procedurally defaulted claims generally cannot be heard in federal court.

22   However, petitioner has shown that she is entitled to an evidentiary hearing on whether (1) the

23   procedural default may be excused and, if so, whether (2) her trial counsel rendered ineffective

24

1   assistance related to the failure to develop and present Dr. Pleus' testimony.  Therefore, the

2   District Court should conduct an evidentiary hearing to answer these questions.  And the Court

3   should grant petitioner's requests for consideration of extra-record evidence, which addresses

4   both of these issues (Dkts. 3, 19).

5       The remaining grounds raised in the petition do not merit habeas relief.  Therefore, the

6   District Court should deny the habeas petition as to grounds two through six, which should be

7   dismissed with prejudice.

8                                    **BACKGROUND**

9       Petitioner brought suit in this court in March 2021.  Dkt. 1.  Briefing on her habeas

10  petition is complete, including her pending motion to expand the record.  Dkts. 3, 10, 19–21.

11  The State has filed the state court record in this matter (Dkts. 11–14), which includes the

12  following account of proceedings in the state courts.

13      At petitioner's trial, the parties presented evidence that on May 23, 2011, petitioner's

14  one-year-old daughter, KM, sustained an eye injury outdoors, while she was in the care of a

15  person other than petitioner.  Dkt. 14, at 1990–91.  Petitioner brought KM to a doctor and

16  obtained a prescription for an eye ointment.  Dkt. 14, at 1995.

17      The State presented various doctors' testimony that KM's eye injury persisted, spreading

18  to both of her eyes, and perplexing doctors, who could not understand why the condition was not

19  resolving.  Dkt. 14, at 762–63.  KM's doctors prescribed an antibiotic eyedrop called

20  Tobramycin on April 26, 2011.  *See* Dkt. 14, at 860, 1743.  On May 2, 2011, petitioner brought

21  KM to the doctor for a prescription refill, and a doctor observed that KM's condition was

22  severe—KM was "quite distressed" and "would not open her eyes," which were red and swollen.

23  Dkt. 14, at 1575.

24

1    At this time, petitioner was primarily staying at the home of her former friend, Courtney

2    Valvoda, and Valvoda's husband, Matthew Bowie.  Dkt. 11-1, at 17.  On May 11, Bowie noticed

3    a "soft spot" on KM's head and alerted Valvoda and petitioner, who said that KM "seemed to be

4    just fine."  Dkt. 14, at 1525, 2047.  Although Valvoda urged petitioner to take KM to the doctor,

5    petitioner did not do so until the next morning.  *See* Dkt. 14, at 1692–94.  Doctors then observed

6    that KM had a "very large bleed" in her brain, and she was airlifted to a medical center, where

7    staff contacted authorities about the suspicious head trauma.  Dkt. 14, at 1120, 1336, 1362.

8    According to investigators, by this time, KM's appearance was "shocking"—her eyes were

9    swollen shut, she was bruised, and the top part of her face looked "extremely painful."  Dkt. 14,

10   at 1371.

11   A doctor and a social worker both testified that petitioner had an unusual, "disinterested"

12   reaction when informed of her daughter's brain injury.  Dkt. 14, at 1807–08, 1946.  Petitioner

13   also gave conflicting versions of whether she or Bowie initially noticed the head injury, and

14   investigators did not believe petitioner's account of how KM sustained the injury.  Dkt. 14, at

15   1125, 1129–30, 1379.  Detectives took KM into protective custody, and they testified at

16   petitioner's trial that when they informed her of this, petitioner was unusually focused—even

17   insistent on—returning to KM's hospital room to give her the eye drops.  Dkt. 14, at 1141, 1144,

18   2121–22.  Until this point, petitioner had been the person who primarily administered KM's

19   medication, according to petitioner's account to detectives.  Dkt. 14, at 1131, 1369.  A doctor

20   later testified that although it was "the last thing on [his] mind" at the time, petitioner having put

21   "something on the eye" would account for KM's eye injuries.

22   Detectives confiscated the eye drops from petitioner.  *See* Dkt. 14, at 248.  The May 2

23   Tobramycin prescription appeared to be full (despite having been filled more than a week

24

1    earlier), and when a detective opened it, she smelled an "overwhelming" "noxious" odor that

2    caused a burning sensation and a welt on her wrist.  Dkt. 14, at 238, 242–43, 259, 268–69, 1384.

3    A doctor similarly testified that when he opened the Tobramycin to perform a test on it, a strong

4    noxious smell filled the room.  Dkt. 14, at 209.  Bowie testified that he remembered the eye

5    drops "stunk," and Valvoda testified that she thought they smelled "mediciny [sic]."  Dkt. 14, at

6    1482, 1656.

7        Five scientists testified for the State that after analyzing the medication, they concluded

8    that it had been adulterated with bleach.  Dkt. 14, at 913, 936, 985, 1005–06, 1028, 1048.  In

9    addition, a doctor who treated KM testified that the clinical picture for KM was most consistent

10   with "some noxious agent being instilled on the eye" and that KM suffered irreversible and

11   permanent damage to her eyes.  Dkt. 14, at 799, 813.  A pediatrician described KM's head injury

12   as "life threatening" and stated that in his opinion, KM's eye injuries appeared to be a chemical

13   type of irritation, not an infection.  Dkt. 14, at 1336, 1343.  An ophthalmologist testified that

14   KM's condition was consistent with bleach having been put in her eyes.  Dkt. 14, at 1585.

15       KM was discharged from the hospital to her father's custody, and her eye condition

16   significantly improved.  Dkt. 14, at 1393, 1396.  However, KM continued to suffer from

17   sensitivity to light and sustained permanent eye damage.  Dkt. 14, at 811.

18       Based on this evidence, the State argued at petitioner's trial that she had contaminated her

19   daughter's eye drop medication with bleach in an attempt to garner sympathy from Valvoda and

20   Bowie and to remain living in their home.  Dkt. 14, at 2208, 2210.  The State also pointed to

21   Bowie's testimony that he and petitioner had been having an affair.  Dkt. 11-1, at 17, 27.

22

23

24

1    Petitioner testified in her defense. She denied having "any personal knowledge as to

2    what's been described from these drops of being a dark color and smell and all that stuff[.]" Dkt.

3    14, at 2064. No other witness testified for the defense.

4    Petitioner's trial counsel had consulted with an expert toxicologist, Dr. Pleus, who

5    provided a preliminary report that there was a lack of scientific support for the conclusion that

6    "the medication that was administered to [KM] caused the adverse effects that are reported in the

7    medical records." Dkt. 11-1, at 425. Dr. Pleus required an additional $8,000 to complete his

8    opinion and provide a brief report and noted that he would require additional funding to prepare

9    for and attend trial as an expert witness. Dkt. 11-1, at 425. Trial counsel never retained Dr.

10    Pleus to complete his opinion or to testify. She explained in her brief affidavit that her request

11    for additional funding was denied, and she now acknowledges that due to an oversight, she

12    abandoned further efforts to retain Dr. Pleus as an expert witness. Dkt. 11-1, at 449. Petitioner's

13    trial counsel did not present any medical evidence to rebut the prosecution.

14    The jury found petitioner guilty, including rendering a special verdict that petitioner used

15    her position of trust to facilitate the crime, knew the child was particularly vulnerable,

16    manifested deliberate cruelty, and caused substantial bodily harm. *See* Dkt. 11-1, at 3, 16. The

17    sentencing court entered an exceptional sentence of 480 months in prison. *See* Dkt. 11-1, at 6–7.

18    Plaintiff appealed to Division One of the Washington State Court of Appeals. She did

19    not argue that her trial counsel rendered ineffective assistance at this juncture, instead focusing

20    on other arguments. *See* Dkt. 11-1, at 16–17. Division One affirmed, and petitioner sought

21    direct review. Dkt. 11-1, at 283. The Washington State Supreme Court denied review without

22    comment. Dkt. 11-1, at 362.

23

24

1    In 2017, petitioner filed a personal restraint petition ("PRP"), acting *pro se*.  Dkt. 11-1, at

2  366.  She argued, among other things, that her trial counsel rendered ineffective assistance, and

3  she provided her trial counsel's declaration and Dr. Pleus's 2013 preliminary statements.  Dkt.

4  11-1, at 367; *see also* Dkt. 11-1, at 454 (allowing petitioner to supplement her PRP).  Petitioner's

5  trial counsel affirmed that she made a mistake related to Dr. Pleus, misunderstanding the import

6  of his preliminary opinions and leading her not to more vigorously attempt to have the

7  Department of Assigned Counsel pay to retain him.  Dkt. 11-1, at 449.

8    Division Two of the Court of Appeals appointed counsel for petitioner and referred the

9  matter to a panel of judges for a decision on the merits.  Dkt. 13, at 26.  This was the first PRP

10  client whom PRP counsel had represented.  PRP counsel did not ask Dr. Pleus to finalize his

11  opinions or to provide additional information regarding how he would have testified if called as a

12  witness, even though the state courts allowed for such submissions.  *See* Dkt. 3-2, at 1–5.  And,

13  in May 2020, Division Two denied the PRP, holding, among other things, that petitioner "failed

14  to meet her prima facie burden of showing prejudice" related to the failure to retain Dr. Pleus as

15  an expert witness.  Dkt. 13, at 188, 198; *see also* Dkt. 14, at 2.  Petitioner sought discretionary

16  review of the denial of her petition.  Dkt. 14, at 5.  However, the Supreme Court Commissioner

17  denied review, citing with approval Division Two's reasoning that petitioner could not show a

18  reasonable probability that Dr. Pleus's testimony would have altered the outcome of petitioner's

19  trial.  Dkt. 14, at 47–49; *see also* Dkt. 14, at 61 (denying motion to modify the Commissioner's

20  ruling).

21    In support of her habeas petition, petitioner now also provides the declarations of her

22  PRP counsel and of Dr. Pleus.  *See* Dkts. 3-1, 3-2, 19-1.  Her PRP counsel concedes that she

23

24

1    mistakenly believed that she could not obtain additional funding for expanded opinions from Dr.

2    Pleus or that she could supplement the PRP with additional evidence.  Dkt. 3-2, at 3.

3             Dr. Pleus has also now provided the court with extensive and detailed reasons why he

4    believes that the state's evidence did not establish that petitioner added bleach to the Tobramycin

5    eyedrops, causing KM's eye injuries.  Dkt. 19-1, at 2; *see also* Dkt. 3-1.  Dr. Pleus states that he

6    completed his review of the trial testimony, laboratory reports, and medical records related to

7    petitioner's case and that if he had been called at trial, he "could have testified to all the gaps,

8    errors, assumptions, and deficiencies at [petitioner's] trial" and "cast[ed] serious doubt on" the

9    "scientific veracity" of the evidence.  Dkt. 19-1, at 4, 6, 15.  Among other things, Dr. Pleus states

10   that he could testify as to fundamental flaws in the laboratory analysis of the Tobramycin sample

11   collected by investigators.  *See* Dkt. 19-1, at 2.  He states that due to issues with record keeping

12   and documentation, the laboratory scientists' conclusions are not dependable and cannot be

13   validated.  *See* Dkt. 19-1, at 2–4.  He asserts that the scientists could have inadvertently

14   contaminated the Tobramycin themselves when they tested it.  Dkt. 19-1, at 5.  In addition, Dr.

15   Pleus asserts that the analysis did not rule out whether some other substance was present in the

16   Tobramycin that caused KM's injuries.  *See* Dkt. 19-1, at 5.  He also states that lack of

17   documentation from the pharmacy that compounded the Tobramycin prescription calls into

18   question whether the eye drops were somehow contaminated before they were in petitioner's

19   possession.  *See* Dkt. 19-1, at 5.  And he claims that the State did not show that petitioner's other

20   medication was not somehow contaminated or that some other issue altogether caused KM's eye

21   injuries.  Dkt. 19-1, at 10, 13–14.

22   *///*

23

24

1

**DISCUSSION**

2

**I. Ineffective Assistance of Counsel Related to Dr. Pleus (Grounds 1 and 2)**

3

    **A. Overview**

4

    A federal court generally may not hear a habeas claim that is "procedurally defaulted."

5 *See Cooper v. Neven*, 641 F.3d 322, 327 (9th Cir. 2011). Procedural default occurs when a state

6 court denies a claim on procedural grounds. *See, e.g.*, *Zichko v. Idaho*, 247 F.3d 1015, 1021 (9th

7 Cir. 2001); *Coleman v. Thompson*, 501 U.S. 722, 729–30, 746–47 (1991). Because the state

8 court necessarily did not fully address procedurally defaulted claims on the merits, such claims

9 are also not "subject to the deferential review of 28 U.S.C. § 2254(d)." *Ramirez v. Ryan*, 937

10 F.3d 1230, 1240 (9th Cir. 2019), *cert. granted sub nom. Shinn v. Ramirez*, 141 S. Ct. 2620

11 (2021).

12

    Even though procedural default generally bars habeas claims, there is a limited exception

13 where in an initial review collateral proceeding (such as the PRP proceedings here), "there was

14 no counsel or counsel in that proceeding was ineffective." *Martinez v. Ryan*, 566 U.S. 1, 17

15 (2012). Under *Martinez*, the federal court may still hear the procedurally defaulted claim if the

16 underlying claim of ineffective assistance of trial counsel is "substantial." *Id.*

17

    Petitioner raises a claim related to trial counsel's failure to call Dr. Pleus as a defense

18 witness. This is exactly the situation discussed in *Martinez*. Petitioner asserts that her trial

19 counsel rendered ineffective assistance by not calling Dr. Pleus and that her PRP counsel

20 compounded this error by failing to investigate and support her PRP with evidence about how

21 Dr. Pleus would have testified. In *Martinez*, the Supreme Court held that such "inadequate

22 assistance of counsel at initial review collateral proceedings may establish cause for a prisoner's

23 procedural default of a claim of ineffective assistance at trial." 566 U.S. at 9.

24

## B.  Procedural Default of Trial Counsel Ineffectiveness Claim

First, the Court agrees with petitioner that the issue related to Dr. Pleus is procedurally defaulted due to petitioner's PRP counsel's failure to better support the PRP's arguments on collateral review.  *See* Dkt. 20, at 8.  Both courts that considered the claim of trial counsel's ineffectiveness related to Dr. Pleus concluded that petitioner had not adequately supported her claim.  Division Two explained that petitioner had to present affidavits or other corroborative evidence to establish what another person would say and that petitioner had not established what Dr. Pleus ultimately would have said at trial.  *See* Dkt. 13, at 226–27.  The Supreme Court Commissioner, who rejected the petition for review in the collateral review proceedings, reiterated that petitioner had not shown prejudice in the Court of Appeals because she did not show what Dr. Pleus's opinion would have been.  *See* Dkt. 14, at 48.

Respondent, for his part, asserts that the state courts did, in fact, adjudicate this issue on the merits.  *See* Dkt. 21, at 5.  Respondent notes that the state courts alternatively concluded that, based on the limited evidence presented in support of the PRP, the failure to call Dr. Pleus as a witness did not prejudice petitioner.  *See* Dkt. 13, at 226–27; Dkt. 14, at 48.  But the state courts' rulings on the merits addressed this issue based on only a limited record—without the benefit of Dr. Pleus's full opinions—and could not have fully considered the merits of the issue of whether trial counsel rendered ineffective assistance.  Even if the state courts expressed an alternate holding on the merits, the underlying claim that trial counsel rendered ineffective assistance was still procedurally defaulted.  Where a state court both applies a procedural rule to deny a claim and alternatively opines that the claim lacks merit, procedural default still applies.  *See Bennett v. Mueller*, 322 F.3d 573, 580 (9th Cir. 2003); *Zapata v. Vasquez*, 788 F.3d 1106, 1112 (9th Cir. 2015).

1    Before this Court can find that petitioner procedurally defaulted her claims related to Dr.

2    Pleus, the Court must also find that the procedural rule that the state courts applied was

3    "independent and adequate."  *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  The rule

4    applied by the state courts as support that petitioner failed to provide adequate evidence to

5    support her claim (the holding of *In re Rice*, 118 Wn.2d 876, 886 (1992)) meets this requirement.

6    *E.g. Corbray v. Miller-Stout*, 469 F. App'x 558, 560 (9th Cir. 2012); *Draggoo v. Miller-Stout*,

7    No. C13-5054 RBL/KLS, 2013 WL 5176760, at *6 (W.D. Wash. Sept. 12, 2013); *Parmelee v.*

8    *Fraker*, No. C09-5273BHS, 2010 WL 546933, at *8 (W.D. Wash. Feb. 11, 2010).

9    Accordingly, the issue regarding trial counsel's effectiveness for not further investigating

10    and calling Dr. Pleus as a witness was procedurally defaulted.  The Court turns to what evidence

11    it may consider in connection with petitioner's claims that the Court should excuse her

12    procedural default of this issue.

13    **C.  Extra-Record Evidence Allowed**

14    Petitioner asks this Court to consider evidence that she did not present to the state courts

15    in support of her claims.  *See* Dkt. 3.  Specifically, petitioner asks this Court to consider Dr.

16    Pleus's declarations about how he would have testified at petitioner's trial, if called for the

17    defense (*see* Dkts. 3-1, 3-2, 19-1) and also to consider her PRP counsel's declaration about her

18    failure to file a declaration by Dr. Pleus as part of her briefing in the PRP.  Dkt. 3-2.  The Court

19    recommends granting petitioner's requests.

20    In general, review under § 2254 is limited to the record that was before the state courts.

21    *See* 28 U.S.C. §§ 2254(d)(2), (e)(2).  However, where the Court considers a claim under

22    *Martinez* for an exception from procedural default, the Court may "consider evidence not

23

24

1    previously presented to the state court." *Jones v. Shinn*, 943 F.3d at 1221.  The Ninth Circuit

2    reasoned in *Jones v. Shinn* that—

> 3    [t]he Supreme Court explained in *Martinez* that if the prisoner's state court attorney
> 4    is ineffective, "the prisoner has been denied fair process and the opportunity to
>      comply with the State's procedures and obtain an adjudication on the merits of his
>      claims."  566 U.S. at 11[.]  The Court's concern was with the prisoner's opportunity
> 5    to "vindicat[e] a substantial ineffective-assistance-of-trial-counsel claim," a claim
>      which "often depend[s] on evidence outside the trial record."  *Id.* at 11, 13[.]  The
> 6    Court held that the federal habeas court may hear a claim of ineffective assistance
>      of trial counsel where the initial state collateral proceeding "may not have been
> 7    sufficient to ensure that proper consideration was given to a substantial
>      claim."  *Id.* at 14[.]
> 8           . . . . Determining whether counsel's performance was deficient often
>      requires asking the attorney to state the strategic or tactical reasons for his actions,
> 9    and determining prejudice often requires discovery and an evidentiary hearing to
>      assess the effect of the deficient performance.  [Citation omitted.]
> 10          . . . .
> 11          While the Supreme Court held in *Cullen v. Pinholster* that a federal habeas
>      court is ordinarily confined to the evidentiary record from state court, it held that
> 12   the court was limited to "the record that was before the state court *that adjudicated
>      the claim on the merits.*" 563 U.S. 170, 180 [] (2011) (emphasis added).  Because
> 13   the underlying claim in a *Martinez* case has not been adjudicated on the merits in a
>      state-court proceeding, "*Martinez* would be a dead letter if a prisoner's only
>      opportunity to develop the factual record of his state PCR counsel's ineffectiveness
> 14   had been in state PCR proceedings, where the same ineffective counsel represented
>      him." *Detrich* [*v. Ryan*, 740 F.3d 1237, 1247 (9th Cir. 2013) (en banc) (plurality)].
> 15   We have explained that "*Martinez* may provide a means to show 'cause' to
>      overcome the default and reach the merits of the new claim."  *Dickens v. Ryan*, 740
> 16   F.3d 1302, 1321 (9th Cir. 2014).  The Supreme Court in *Martinez* recognized that
>      "[c]laims of ineffective assistance at trial often require investigative work." 566
> 17   U.S. at 11[.]  Courts may require expanded records to reach the merits of these
>      claims.

18   *Jones*, 943 F.3d at 1221–22.

19          Proper evaluation of these witnesses' testimony is critical to deciding whether

20   petitioner's trial and PRP counsel failed to provide effective assistance and whether Dr. Pleus's

21   testimony at trial had a reasonable probability of changing the outcome.  Therefore, the District

22   Court should grant the requests for consideration of extra-record evidence.  Dkts. 3, 19.  In the

23

24

1    remainder of this analysis, this Court will consider the extra-record evidence, consisting of two

2    declarations from Dr. Pleus and a declaration from petitioner's PRP counsel.

3         Dr. Pleus gives extensive and detailed reasons why he believes that the state's evidence

4    did not establish that petitioner added bleach to the Tobramycin eyedrops, causing KM's eye

5    injuries.  Dkt. 19-1, at 2; *see also* Dkt. 3-1.  Petitioner's PRP counsel explains that she

6    mistakenly believed she could neither obtain additional funding for expanded opinions from Dr.

7    Pleus nor supplement petitioner's PRP with additional evidence.  Dkt. 3-2, at 3.

8         Also relevant to petitioner's procedurally defaulted claim that trial counsel rendered

9    ineffective assistance are the declaration from her trial counsel and the memoranda that Dr. Pleus

10   provided in 2013.  Dr. Pleus initially opined that "the data provided to me does not scientifically

11   support the Plaintiff's case that the medication that was administered to [KM] caused the adverse

12   effects that are reported in the medical records."  Dkt. 11-1, at 423, 425.  Trial counsel explains

13   that she misunderstood the import of Dr. Pleus's initial opinion, believing that he meant that the

14   eye drops as compounded by the pharmacy that prepared them could not have harmed KM.  *See*

15   Dkt. 11-1, at 449.  Trial counsel states that had she accurately understood Dr. Pleus's initial

16   statements, she would have "more vigorously sought additional funding to complete Dr. Pleus's

17   work."  Dkt. 11-1, at 449.

18        The Court turns to whether this evidence is adequate to merit an evidentiary hearing.  *See*

19   *Detrich*, 740 F.3d at 1246 ("For procedurally defaulted claims, to which *Martinez* is applicable,

20   the district court should allow discovery and hold an evidentiary hearing where appropriate to

21   determine whether there was 'cause' under *Martinez* for the state-court procedural default and to

22   determine, if the default is excused, whether there has been trial-counsel IAC.").

23

24

**D.  Colorable Claim of "Cause" and "Prejudice" to Excuse the Default**

The Ninth Circuit has explained that—

> [T]o establish cause and prejudice in order to excuse the procedural default of his ineffective assistance of trial counsel claim, [petitioner] must demonstrate the following: (1) post-conviction counsel performed deficiently; (2) "there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different," [citation omitted]; and (3) the "underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit."
> *Martinez*, 566 U.S. at 14[].

*Ramirez v. Ryan*, 937 F.3d at 1242.

Petitioner's evidence creates colorable issues on each of these three points.

**1.    Substantiality of Underlying Claim**

Beginning with the third point from *Ramirez*, petitioner has provided materials demonstrating that her claim of ineffective assistance of trial counsel has at least "some merit." *See Ramirez v. Ryan*, 937 F.3d at 1242.

Petitioner must show that her counsel's performance "fell below an objective standard of reasonableness" measured by "prevailing professional norms." *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  The Court must indulge a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689–90.  Nevertheless "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. . . .  [A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691.

Trial counsel admits in her declaration that she misunderstood the import of Dr. Pleus's memoranda when she was preparing for petitioner's trial, thinking that he would not provide exculpatory testimony.  Dkt. 11-1, at 449.  "[S]trategic choices made after less than complete

1    investigation are reasonable precisely to the extent that reasonable professional judgments

2    support the limitations on investigation[.]" *Strickland*, 466 U.S. at 690–91.  Here, the materials

3    that petitioner has provided support that the limitation on investigation and retention of Dr. Pleus

4    may have been based on a mistake, not reasonable professional judgment.

5            Respondent argues that the inquiry into counsel's performance is objective, so that even

6    if counsel made a mistake, the Court cannot find that counsel rendered deficient performance so

7    long as there might be a strategic reason not to pursue retaining Dr. Pleus.  *See* Dkt. 10, at 47.

8    Respondent asserts that such a reason is apparent here:  trial counsel *did* ask for additional

9    funding for Dr. Pleus to complete his opinions but the Department of Assigned Counsel

10   ("DAC") denied her request.  Dkt. 11-1, at 449.  But respondent ignores that trial counsel

11   continues by saying that she still would have "more vigorously" sought additional funding had

12   she not been under the mistaken belief that Dr. Pleus could not provide exculpatory evidence.

13   Dkt. 11-1, at 449.

14           Trial counsel's declaration creates more questions than it answers.  For instance, it is not

15   entirely clear whether trial counsel's misunderstanding of Dr. Pleus's opinion led to her failure to

16   obtain additional funding to finalize Dr. Pleus's opinions or whether her failure to receive

17   funding may have been the result of other factors beyond her control.  *See also Thomas v.*

18   *Chappell*, 678 F.3d 1086, 1104 (9th Cir. 2012) (holding that trial counsel rendered ineffective

19   assistance by not calling a witness based on an incorrect understanding of the witness's

20   testimony and a lack of sufficient information to make an informed decision).  This can best be

21   determined by an evidentiary hearing giving both sides an opportunity to explore that issue.

22           Nor is the Court convinced by respondent's citation to *Harrington v. Richter*, 562 U.S.

23   86, 96 (2011).  That case involved review of a claim fully examined by state courts, so that the

24

1    state courts' decision was entitled to AEDPA deference. Indeed, in *Harrington*, the Court

2    acknowledged that "[i]f this case presented a *de novo* review of *Strickland,* the foregoing might

3    well suffice to reject the claim of inadequate counsel, but that is an unnecessary step" in light of

4    the nature of the review. *Harrington*, 562 U.S. at 109.

5         The Court also finds that petitioner has shown at least a colorable claim of prejudice from

6    her trial counsel's failure to retain Dr. Pleus to testify as a defense witness. As noted, Dr. Pleus

7    asserts that his testimony would have cast serious doubt on the State's scientific evidence and

8    whether the eye drops contained bleach. In addition, he states that his testimony would have

9    illuminated various gaps and deficiencies in the trial evidence. *See* Dkt. 19-1, at 4, 15. Dr. Pleus

10   primarily addresses the flaws in the laboratory analysis leading him to question the dependability

11   of the analysts' conclusions. But he also asserts that the State could not rule out that some other

12   substance in the eye drops caused KM's injuries or that the eye drops were contaminated by

13   some other means before they came into petitioner's possession. Dkt. 19-1, at 5, 10, 13–14.

14        At petitioner's trial, five laboratory analysts testified for the prosecution that the

15   Tobramycin medicine had been spiked with bleach. Dkt. 14, at 913, 936, 985, 1005–06, 1028,

16   1048. Petitioner, for her part, took the stand in her defense and denied knowledge of issues with

17   the eye drops. Dr. Pleus's testimony, as he describes it, would have provided expert testimony

18   supporting the defense and could have cast doubt on the analysts' methods and conclusion,

19   lending credence to petitioner's general denial that there were issues with the eye drops. *See*

20   Dkt. 19-1, at 2–5. Petitioner has made a reasonable argument that Dr. Pleus's testimony could

21   have made a difference by rebutting the otherwise uncontroverted and detailed expert testimony.

22        The State presented other evidence that there was bleach in the eye drops. Namely,

23   doctors who treated KM testified that her injuries were consistent with repeated exposure to a

24

1    caustic agent and that they did not believe that there was another, unidentified cause for the

2    injuries. *See* Dkt. 14, at 748, 812–13, 857, 861, 863, 866, 1101, 1342–43, 1585. But Dr. Pleus's

3    testimony could also have created factual issues related to this evidence, if believed and if he

4    testified as he describes. He would have raised the issues that bleach could have been added by

5    the compounding pharmacy (not petitioner), that the Tobramycin or another eye medication had

6    been contaminated with some other substance that injured KM's eyes, or that there was some

7    other explanation altogether for the injuries. Dkt. 19-1, at 5, 10.

8        It is not unusual for a trial to hinge on "a battle of the experts," and it is often difficult to

9    decide which expert to believe. But here, there was no battle because no expert was called by the

10   defense to support her denials. Therefore, considering the efficacy of Dr. Pleus' testimony is

11   important to determine if plaintiff's trial counsel failed to provide adequate representation.

12                        **2.    Post-Conviction Counsel's Performance**

13       Next, the Court examines whether petitioner has provided evidence that could support a

14   finding that her post-conviction counsel performed deficiently. *See Ramirez*, 937 F.3d at 1242.

15       PRP counsel states that she rested on the evidence (Dr. Pleus's initial memoranda and her

16   trial counsel's declaration) that petitioner had provided, acting *pro se*, when petitioner first filed

17   her PRP. The state courts found this evidence inadequate to show a *prima facie* case that trial

18   counsel rendered ineffective assistance. *See* Dkt. 14, at 48 (the Supreme Court commissioner's

19   ruling that "[petitioner] did not show what Dr. Pleus's ultimate opinion would have been or what

20   his testimony would have consisted of. . . ."). And PRP counsel acknowledges that was her first

21   case representing a petitioner in a PRP proceeding and that she failed to seek funding to retain

22   Dr. Pleus for further opinions or to move to submit supplemental evidence in support of the PRP

23   even though she now understands that she could have done so. *See* Dkt. 3-2, at 4; *see also In re*

24

1    *Skylstad*, 160 Wn.2d 944, 947 (2007) (granting motion to supplement the record in a PRP

2    proceeding); *Matter of Pauley*, 17 Wash. App. 2d 1043 (similar); RAP 16.11(b), 16.17.  This

3    evidence supports a viable claim that petitioner's PRP counsel's actions were not the result of a

4    defensible professional judgment but an oversight founded on a mistaken understanding of the

5    law.

6         Further, petitioner's evidence creates a viable claim that this Court could find a

7    reasonable probability that, absent PRP counsel's deficient performance, the result of the post-

8    conviction proceedings would have been different.  As noted, the state courts rejected the claim

9    that trial counsel rendered ineffective assistance due to PRP counsel's failure to substantiate the

10   claim with admissible evidence during the PRP proceedings.  Although the state courts opined

11   that petitioner could not show that Dr. Pleus's opinions would have changed the outcome of the

12   trial, these holdings relied on Dr. Pleus's cursory, incomplete statements provided to trial counsel

13   in 2013.  And this limited record was, according to petitioner's materials, the consequence of her

14   PRP counsel's mistakes.

15        **G.  Remedy**

16        In sum, petitioner has provided evidence that creates colorable issues regarding whether

17   (1) her claim of ineffective assistance of trial counsel is "substantial," and (2) her counsel in

18   initial review collateral proceedings was ineffective.  These are the prerequisites for allowing a

19   federal court to hear an otherwise procedurally defaulted claim that trial counsel rendered

20   ineffective assistance.  *Martinez*, 566 U.S. at 17.  Similarly, she has also created colorable issues

21   regarding whether on the merits, her habeas petition should be granted because she has shown

22   that her trial counsel rendered ineffective assistance.

23

24

1     The appropriate remedy in this circumstance is to hold an evidentiary hearing pursuant to

2    *Martinez v. Ryan*, 566 U.S. 1.  At the evidentiary hearing, the Court should consider "whether

3    there was 'cause' . . . for the state-court procedural default" (*Detrich v. Ryan*, 740 F.3d 1237,

4    1246 (9th Cir. 2013) (en banc) (plurality))—that is whether PRP counsel rendered ineffective

5    assistance by failing to submit Dr. Pleus' full opinion to the state courts during the PRP.  And the

6    Court should consider, ""if the default is excused, whether there has been trial-counsel

7    [ineffective assistance]" because trial counsel did not obtain Dr. Pleus' completed analysis or

8    testimony at trial.  *Id.*  Depending upon the outcome of the evidentiary hearing, the Court can

9    decide whether petition should be granted.

10     Consistent with the Advisory Notes to the Rules Governing Section 2254 and 2255

11    petitions, it is appropriate for this Court to issue a Report and Recommendation to the District

12    Court on the issue of whether to hold an evidentiary hearing.  *See* 5C West's Fed. Forms, District

13    Courts-Criminal Appendix B (5th ed.) ("Subdivision (b) [of the Rules] provides that a magistrate

14    [judge], when so empowered by rule of the district court, may recommend to the district judge

15    that an evidentiary hearing be held or that the petition be dismissed, provided [the magistrate

16    judge] gives the district judge a sufficiently detailed description of the facts so that the judge may

17    decide whether or not to hold an evidentiary hearing."); *see also Orand v. United States*, 602

18    F.2d 207, 208 (9th Cir. 1979) (explaining that Congress has clearly expressed its intent that

19    magistrate judges *may* conduct evidentiary hearings).  The undersigned defers to the District

20    Court on the issue of whether the undersigned or the District Court judge should conduct the

21    hearing.

22     The Court turns to the remaining grounds for relief, which fail.

23    ///

24

1    **II. Remaining Grounds**

2        **A. Legal Standard**

3        Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),

4    petitioner is barred from relitigating any claim presented to the state courts unless the

5    adjudication "resulted in a decision that was contrary to, or involved an unreasonable application

6    of, clearly established Federal law, as determined by the Supreme Court of the United States"

7    (28 U.S.C. § 2254(d)(1)), or if the adjudication "resulted in a decision that was based on an

8    unreasonable determination of the facts in light of the evidence presented in the State court

9    proceeding." 28 U.S.C.§ 2254(d)(2); *see Harrington*, 562 U.S. at 98.

10       **B. Trial Counsel's Failure to Ask Petitioner about Her Guilt (Ground 2)**

11       Petitioner briefly argues that the state courts wrongly decided her claim that trial counsel

12   rendered ineffective assistance by not directly asking her whether she contaminated the eye

13   drops. *See* Dkt. 2, at 13–14.

14       A petitioner bringing a claim that counsel rendered ineffective assistance must "do more

15   than show that [s]he would have satisfied *Strickland*'s test if [her] claim were being analyzed in

16   the first instance." *Bell v. Cone*, 535 U.S. 685, 698–99 (2002) (citations omitted). "[U]nder §

17   2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment,

18   the state-court decision applied *Strickland* incorrectly. Rather, [s]he must show that the [state

19   court] applied *Strickland* to the facts of [her] case in an objectively unreasonable manner." *Id.* at

20   699.

21       Here, the Supreme Court Commissioner ruled that "the Court of Appeals sustainably held

22   that counsel procured an effective denial, and that [petitioner] otherwise demonstrated no

23   prejudice." Dkt. 14, at 49. In support of this conclusion, the Commissioner pointed to defense

24

1    counsel's question whether petitioner "had any 'personal knowledge as to what's been described

2    from these drops of being a dark color and smell and all that stuff'" and petitioner's response of

3    "'[n]o.  That's nothing that I've seen.'"  Dkt. 14, at 49.  Based on this testimony, "[e]ffectively,

4    [petitioner] denied contaminating the eye drops, but even if counsel failed to procure an

5    unequivocal denial, the Court of Appeals properly found no showing of prejudice."  Dkt. 14, at

6    49–50.  The Commissioner also concluded that petitioner failed to support to other grounds for

7    relief with argument showing that they merited the Supreme Court's review.  Dkt. 14, at 50.

8         Petitioner points out that the prosecutor highlighted the lack of any explicit denial by

9    petitioner (*see* Dkt. 2, at 14) and that in contrast to petitioner, Bowie and Valvoda explicitly

10   denied adding anything to the eye drops.  Dkt. 2, at 14.  However, as the state courts reasonably

11   concluded, petitioner's denial of knowledge that the eye drops had been contaminated was

12   tantamount to claiming she was innocent of contaminating the eye drops.  Defense counsel

13   reiterated in closing that petitioner did not know about issues with the eye drops.  *See* Dkt. 14, at

14   2233, 2236.  Lack of an even more explicit denial from petitioner did not prevent defense

15   counsel from arguing that her client was not guilty—nor did it give the State additional evidence

16   that it did not already have.  Petitioner fails to show that the state courts unreasonably applied

17   federal law or unreasonably determined the facts when they rejected this claim.

18              **C.  Trial Counsel's Failure to Prepare Petitioner for Trial (Ground 2)**

19        Petitioner argues that her trial counsel failed to adequately prepare petitioner for her trial,

20   particularly for her trial testimony.  Dkt. 2, at 14.  She points to her trial counsel's statement

21   acknowledging that there was never a meeting devoted "solely" to preparing petitioner to testify

22   and that trial counsel never provided petitioner with a list of questions that would be asked on

23   direct.  Dkt. 11-1, at 450.

24

1        The parties agree that this Court looks to Division Two's decision, as the Supreme Court

2   Commissioner did not address the issue on the merits.  *See* Dkt. 2, at 16; Dkt. 10, at 52.

3   Division Two denied the claim on the basis that petitioner had not shown that the alleged

4   deficient representation prejudiced her.  Dkt. 13, at 229.  The Court held that petitioner "testified

5   articulately and thoroughly throughout her direct and cross-examinations."  Dkt. 13, at 229.

6   Moreover, "she has not established that more preparation would have had any practical effect on

7   the outcome of her trial, especially since she was testifying about recent events from her own life

8   that she should have been able to recall without extensive preparation."  Dkt. 13, at 229.

9        The Court does not agree with petitioner that this was an unreasonable application of

10  clearly established federal law or an unreasonable determination of the facts in light of the

11  evidence presented.  Notably, petitioner does not rely on evidence that her trial counsel utterly

12  failed to prepare her for trial.  That was not the case.  *See* Dkt. 11-1, at 449 (trial counsel's

13  statement that she met "numerous times" with petitioner over the course of the representation,

14  that counsel "generally advised [petitioner] on how to testify," and that counsel incorporated

15  some of petitioner's questions for direct examination of petitioner).  "[T]here is no established

16  'minimum number of meetings between counsel and client prior to trial necessary to prepare an

17  attorney to provide effective assistance of counsel.'"  *Moody v. Polk*, 408 F.3d 141, 148 (4th Cir.

18  2005) (internal citation omitted).

19       Petitioner points to one part of her trial testimony as support that she was "unprepared"

20  and the prosecutor "took advantage" of this.  Dkt. 2, at 16.  The excerpt she points to is a brief

21  portion of her testimony in which she corrected herself about whether she had starting using

22  prescriptions filled on May 2.  Dkt. 14, at 2090.  Her citation to the record fails to show that the

23  state courts unreasonably determined the facts in light of the evidence presented.  As Division

24

1    Two observed, on cross-examination petitioner had clearly testified regarding the chronology of

2    events.  *See* Dkt. 14, at 2067–101.  Her limited self-correction is not enough to conclude that the

3    state courts unreasonably found that petitioner had failed to show prejudice.  For instance,

4    petitioner fails to explain how she otherwise would have testified differently had she had a

5    meeting with counsel before trial that "solely" focused on preparing her for trial.

6            Petitioner cites to *Pierce v. Administrator New Jersey State Prison*, 808 F. App'x 108,

7    113 (3d Cir. 2020), which is not binding authority on this Court.  Even if it were, this case

8    presents distinct circumstances, as in *Pierce*, there was clearly prejudice from counsel's failure to

9    meet with the defendant and advise him to take the stand, where only minimal evidence

10   supported the conviction.  Petitioner also cites to *Kimmelman v. Morrison*, 477 U.S. 365, 386,

11   106 S. Ct. 2574, 2589, 91 L. Ed. 2d 305 (1986), which deals with a distinct situation, in which

12   there was "a total failure to conduct pre-trial discovery[.]"

13           Petitioner fails to show that the state courts unreasonably determined the facts or applied

14   clearly established federal law to this claim.

15               **D.  Prosecutorial Misconduct (Ground 3)**

16               **1.  Comment on Failure to Deny Tampering Eye Drops**

17           Petitioner argues that the prosecutor committed misconduct in closing argument by

18   referring to petitioner's lack of denial at trial that she tampered with the eye drops.  Dkt. 2, at 18.

19           During closing argument, the prosecutor argued (without the defense objecting) that

20   petitioner "never said she didn't put anything into [KM's] eye drops.  She said that she didn't

21   know anything about the change of color, no personal knowledge about that or the toxic smell."

22   Dkt. 14, at 2212.

23

24

1       Division One reasoned that "[a]n argument that the defense evidence is lacking does not

2   constitute prosecutorial misconduct or shift the burden of proof to the defense." Dkt. 11-1, at 62

3   (internal citation omitted).  Further, Division One concluded that the argument relied on

4   reasonable inferences from petitioner's testimony and that, in any event, the lack of objection

5   waived this alleged error.  Dkt. 11-1, at 63–64.

6       This conclusion is consistent with clearly established federal law.  In *Demirdjian v.*

7   *Gipson*, 832 F.3d 1060, 1071 (9th Cir. 2016), the Ninth Circuit rejected an argument that counsel

8   should have objected to the prosecutor shifting the burden of proof, when a prosecutor's

9   arguments in closing essentially attacked the weakness of the defense case and invited counsel to

10   provide admissible evidence to support it.  The comment on the failure to present exculpatory

11   evidence was permissible because the burden of proof was neither expressly nor implicitly

12   shifted and because the prosecutor expressly told the jury that the government bore the burden of

13   proof. *Id.*

14       Petitioner argues that similar argument, here, shifted the burden of proof.  But as in

15   *Demirdjian*, the prosecutor repeatedly stated that the State bore the burden of proof. *E.g.*, Dkt.

16   14, at 2185, 2187, 2210–11.  This is not like petitioner's cited case *United States v. Sandoval-*

17   *Gonzalez*, where the prosecutor told the jury that certain evidence created a presumption against

18   the defendant for one element of a crime. *See* 642 F.3d 717, 721, 726 (9th Cir. 2011).  Here, the

19   prosecutor told the jury that the state bore the burden but that the defense's case was weak for

20   reasons including that petitioner did not specifically deny tampering with the eye drops.

21       Petitioner also points to the rebuttal closing argument.  On rebuttal, the prosecutor

22   referred to defense counsel's closing argument that "you don't have an intentional assault if there

23   was something wrong with the medications and the defendant didn't know about it." Dkt. 14, at

24

2250.  The prosecutor argued, that, however, it was not a case of petitioner being ignorant about the contamination:  "[b]ut again, I submit to you that this is the case.  The defendant never said that she didn't intentionally do something to the drops."  Dkt. 14, at 2250.  Defense counsel objected on the basis of burden shifting, but the trial court overruled the objection.  Dkt. 14, at 2250–51.

Division One cited authority that "[e]ven where the comments are improper, the remarks by the prosecutor are not grounds for reversal if they were invited or provoked by defense counsel and are in reply to [her] acts and statements, unless the remarks are not a pertinent reply or are so prejudicial that a curative instruction would be ineffective."  Dkt. 11-1, at 64 (internal citations and quotation marks omitted).  Division One held that the comments in rebuttal were "in pertinent reply to the argument of defense" and were not improper.  Dkt. 11-1, at 65.

A prosecutor may respond in rebuttal to an attack made in the defendant's closing argument.  *See Lawn v. United States*, 355 U.S. 339, 359 n. 15 (1958).  And as noted, the comment on petitioner not explicitly denying tampering with the eye drops was a reasonable inference from the evidence, which the prosecutor was allowed to draw.  Petitioner fails to show that Division One unreasonably applied federal law when deciding this issue.

### 2.  Brownie Analogy

Petitioner next argues that the prosecutor "trivialized" the State's burden of proof by using an analogy about a parent determining who took brownies.  Dkt. 2, at 18.  Petitioner also references a "puzzle" argument but does not develop or explain the basis for this argument, so that the Court does not address it further.  Dkt. 2, at 18.

The prosecutor discussed a jury instruction describing the difference between direct and circumstantial evidence, explaining that "[t]he law does not give one type of evidence any more

weight . . . than the other." Dkt. 14, at 2182.  She used an analogy to illustrate the point:  a

parent who leaves a stack of brownies on the kitchen counter with her child staring intently at

them and returns ten minutes later to see the stack smaller, the child with a "little smudge on his

check," and a sticky remote control. Dkt. 14, at 2183.  The prosecutor argued, "[y]ou didn't see

[the child] take anything, you didn't see him actually eat it, but what can you reasonably infer

based on what you did see?" Dkt. 14, at 2183.  And if the child tried to blame the family dog,

"what's the reasonable inference? . . . There will always be other possibilities.  But what's the

reasonable conclusion based on what you do have?  That your son ate the brownies." Dkt. 14, at

2183.

Division One disagreed that this analogy misstated or trivialized the burden of proof.

Dkt. 11-1, at 62.  The Court does not agree with petitioner that this holding was contrary to or an

unreasonable application of clearly established federal law.  Prosecutors may use analogies

during closing argument (*e.g.*, *United States v. Swanson*, 703 F. App'x 487, 489 (9th Cir. 2017)),

and this argument did not lower the State's burden of proof.  Rather, it permissibly conveyed that

circumstantial evidence was equally probative as direct evidence.

Petitioner argues that this analogy conflates reasonable inferences with proof beyond a

reasonable doubt and implies that the existence of alternative possibilities does not create a

reasonable doubt. Dkt. 2, at 19.  She argues that the argument "misstated the government's

burden by likening it to a reasonable inference." Dkt. 2, at 19.  Her argument fails to show that

the state court misapplied clearly established federal law when it rejected her arguments.  A

criminal verdict certainly may rest on reasonable inferences from the State's evidence. *Cf.*

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (sufficient evidence supports a conviction if the

evidence viewed in the State's favor—including reasonable inferences therefrom—could result

1    in a rational trier of fact finding the essential elements of the crime beyond a reasonable

2    doubt)*.  Moreover, the prosecutor repeatedly reminded the jury that the State's burden of proof

3    was proof beyond a reasonable doubt during her closing argument.  Dkt. 14, at 2185, 2187–88,

4    2210, 2211.

5           Petitioner points to cases in which the prosecutor explicitly told the jury that there would

6    be a "presumption of guilt" (*United States v. Perlaza*, 439 F.3d 1149, 1169 (9th Cir. 2006)) and a

7    "presumption" against the defendant on one of the elements of the offense.  *Sandoval-Gonzalez*,

8    642 F.3d at 725.  But the prosecutor's argument herein did not create a "presumption" against

9    petitioner, and these cases therefore do not control the outcome here.  Nor does the Court agree

10   that the brownie analogy was similar to impermissible argument in *United States v. Velazquez*, 1

11   F.4th 1132, 1136–38 (9th Cir. 2021), where the prosecutor told the jury that a "reasonable doubt"

12   was something used to make daily decisions with casual judgment.  Here, the analogy did not

13   exhort the jury to rest on "fallacious" assumptions about daily life (*see id.* at 1138) but explained

14   that the jury should compare the viability of reasonable alternative assumptions from the

15   evidence.

16          Petitioner fails to show that the state court unreasonably applied clearly established

17   federal law or unreasonably determined the facts when it rejected her prosecutorial misconduct

18   claim in this regard.

19                              **E.  Cumulative Error (Ground 4)**

20          Petitioner argues that cumulative error requires granting her habeas petition.  Dkt. 2, at

21   21.  "[T]he combined effect of multiple trial court errors violates due process where it renders

22   the resulting criminal trial fundamentally unfair."  *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir.

23   2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 298, 302–03 (1973)).  "Even if no single

24

1  error [is] sufficiently prejudicial, where there are several substantial errors, 'their cumulative

2  effect may nevertheless, be so prejudicial as to require reversal.'" *Killian v. Poole*, 282 F.3d

3  1204, 1211 (9th Cir. 2002) (quoting *United States v. de Cruz*, 82 F.3d 856, 868 (9th Cir. 1996)).

4  　　　　Division One held that petitioner had failed to show cumulative error justifying reversal.

5  Dkt. 11-1, at 65.  As noted above, the Court finds that an evidentiary hearing related to the issue

6  of trial counsel's failure to call Dr. Pleus as a defense witness is appropriate.  However, the Court

7  does not conclude that the other bases for alleged ineffective assistance of counsel—that is,

8  failure to better prepare petitioner for trial or to elicit her denial that she tampered with the eye

9  drops—would accumulate with any error related to Dr. Pleus's testimony in a manner otherwise

10  depriving petitioner of a fair trial.  *See Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011)

11  (granting habeas relief under the cumulative effects doctrine is appropriate when there is a

12  "unique symmetry" of otherwise harmless errors, such that they amplify each other in relation to

13  a key contested issue in the case).  Petitioner fails to show that the state court unreasonably

14  applied clearly established federal law when it rejected her cumulative error claim.

15  　　　　　　**F.  Arguments Related to Aggravating Factors (Grounds 5 and 6)**

16  　　　　　　　　　　**1.  Unconstitutionally Vague**

17  　　　　Petitioner argues that the aggravating factors (deliberate cruelty and particular

18  vulnerability of the victim) found by the jury at her trial are unconstitutionally vague.  Dkt. 2, at

19  24.  However, the Supreme Court has not clearly established that aggravating factors used to

20  impose an exceptional sentence in a non-capital case can be void for vagueness.

21  　　　　"[T]he Due Process Clause prohibits the Government from 'taking away someone's life,

22  liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice

23  of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Beckles v.*

24

1    *United States*, 137 S. Ct. 886, 892 (2017) (internal citation omitted).  "Applying this standard,

2    the Court has invalidated two kinds of criminal laws as 'void for vagueness': laws

3    that define criminal offenses and laws that fix the permissible sentences for criminal offenses."

4    *Id.*

5            Washington law lists two circumstances ("aggravating factors'), as relevant here, which

6    may "support a sentence above the standard range."  First, that "[t]he defendant's conduct during

7    the commission of the current offense manifested deliberate cruelty to the victim."  RCW

8    9.94A.535(3)(a).  And second, that "[t]he defendant knew or should have known that the victim

9    of the current offense was particularly vulnerable or incapable of resistance."  RCW

10   9.94A.535(3)(b).  If proven to a jury beyond a reasonable doubt, the sentencing court "may"

11   impose "a term of confinement up to the maximum allowed under RCW 9A.20.021 for the

12   underlying conviction if it finds . . . that the facts found are substantial and compelling reasons

13   justifying an exceptional sentence."  RCW 9.94A.537(3), (5).

14           Division One addressed petitioner's arguments on direct appeal, explaining that the

15   Washington State Supreme Court had held that sentencing guidelines could not be void for

16   vagueness.  *See* Dkt. 11-1, at 65.  Division One rejected petitioner's argument that U.S. Supreme

17   Court case law holding that a sentencing enhancement requires jury findings or a defense

18   stipulation required a different outcome.  Dkt. 11-1, at 66.  Division One held that "[t]hese

19   aggravating [factors] do not define conduct, authorize arrest, inform the public of criminal

20   penalties, or vary legislatively defined criminal penalties."  Dkt. 11-1, at 66.

21           Petitioner cites a trio of U.S. Supreme Court cases in support of her argument that due

22   process concerns apply to the aggravating factors here.  In *Apprendi v. New Jersey*, the Supreme

23   Court held that other than the fact of a prior conviction, any fact increasing the penalty for a

24

1  crime beyond the prescribed statutory maximum had to be found by a jury and proved beyond a

2  reasonable doubt.  530 U.S. 466, 490 (2000).  In *Blakely v. Washington*, the Supreme Court

3  clarified that the relevant "statutory maximum" is the maximum sentence a judge may impose

4  without the additional findings (such as, in that case, deliberate cruelty).  542 U.S. 296, 303

5  (2004).  And in *Alleyne v. United States*, the Supreme Court held that any fact increasing a

6  mandatory minimum sentence was an "element" of the crime that had to be submitted to the jury

7  and found beyond a reasonable doubt.  570 U.S. 99, 103 (2013).  As petitioner points out,

8  *Apprendi* referenced due process as the basis for its holding.  But the specific due process

9  protection extended by *Apprendi* is the "indisputabl[e]" entitlement of "a criminal defendant to a

10  jury determination that [he] is guilty of every element of the crime with which he is charged,

11  beyond a reasonable doubt."  530 U.S. at 477 (internal quotation marks and citation omitted).

12  None of the three cases relied upon by petitioner extend due process's protection against vague

13  laws to aggravating factors.

14         Indeed, after each of the three cited cases, the Supreme Court decided *Beckles v. United*

15  *States*, holding that a clause in a federal sentencing enhancement was not subject to a void for

16  vagueness challenge.  137 S. Ct. at 890; *but see Tuilaepa v. California*, 512 U.S. 967, 972

17  (applying void for vagueness principles to special circumstances required to be found in capital

18  cases).  *Beckles* explained that pertinent to sentencing issues, the Court has invalidated laws "that

19  *fix the permissible sentences* for criminal offenses" because "statutes fixing sentences . . . must

20  specify the range of available sentences with sufficient clarity."  *Id.* at 892 (internal quotation

21  marks and citations omitted).  However, *Beckles* contrasted the enhancement guideline at issue in

22  that case—which "merely guide[d] the exercise of a court's discretion in choosing an appropriate

23  sentence within the statutory range"—with a situation in which sentencing courts were

24

1    "required" to increase a defendant's prison term from the statutory maximum.  The former

2    situation was not subject to a challenge that it was impermissibly vague.

3         Here, as in *Beckles*, the aggravating factor is discretionary, not mandatory.  *See* RCW

4    9.94A.537(3), (5).  The aggravating factors may allow a trial court to impose an exceptional

5    sentence above the standard range, not to exceed the statutory maximum, which is set by

6    reference to a different portion of the state's sentencing scheme.  *See* RCW 9A.20.021.  Division

7    One's ruling properly applied *Beckles* and did not amount to an unreasonable application of

8    clearly established federal law.

9         The Court is not persuaded to the contrary by petitioner's reliance on *United States v.*

10   *Hudson*, 986 F.3d 1206, 1210 (9th Cir. 2021).  This case did not hold that aggravating factors

11   such as the ones in RCW 9.94A.535(3) are subject to a void for vagueness challenge.  Indeed,

12   the Ninth Circuit did not address whether the statute at issue was subject to such a challenge,

13   finding instead that the language was not void for vagueness.  In any event, the statute at issue in

14   *Hudson* was mandatory and increased the maximum penalty, in contrast to the aggravating

15   factors at issue here.  *See* 986 F.3d at 1210.

16                                 **2.  Double Jeopardy**

17        Petitioner alternatively argues that it violated double jeopardy to both convict her of

18   assault and find the aggravating factors of deliberate cruelty and particular vulnerability.  Dkt. 2,

19   at 26.

20        The Fifth Amendment guarantee against double jeopardy protects not only against a

21   second trial for the same offense, but also "against multiple punishments for the same offense."

22   *Whalen v. United States*, 445 U.S. 684, 688 (1980) (citing *North Carolina v. Pierce*, 395 U.S.

23   711, 717 (1969)).

24

1    Division One addressed petitioner's argument and applied Washington State precedent

2    holding that petitioner's cited case law does not implicate the double jeopardy clause.  Dkt. 11-1,

3    at 66.  Petitioner reiterates her argument that *Apprendi*, *Blakely*, and *Alleyne* "require double

4    jeopardy principles apply to aggravating circumstances outside the death penalty context," but

5    none of these cases mention double jeopardy.  *See* Dkt. 2, at 26.  Petitioner also cites *Ring v.*

6    *Arizona*, but this case concerns the Sixth—not the Fifth—Amendment.  *Ring v. Arizona*, 536

7    U.S. 584, 588 (2002).  Indeed, the Supreme Court has held that the Double Jeopardy Clause's

8    protections do not apply to non-capital sentencing enhancements.  *See Monge v. California*, 524

9    U.S. 721, 728 (1998) ("Historically, we have found double jeopardy protections inapplicable to

10   sentencing proceedings . . . because the determinations at issue do not place a defendant in

11   jeopardy for an 'offense'. . . .  Nor have sentence enhancements been construed as additional

12   punishment for the previous offense; rather, they act to increase a sentence 'because of the

13   manner in which [the defendant] committed the crime of conviction.'" (Citations omitted)).

14   Petitioner fails to show that Division One unreasonably applied clearly established

15   federal law when it rejected her arguments.

16   **G.  Evidentiary Hearing and Certificate of Appealability (Grounds 2 through 6)**

17   The decision to hold an evidentiary hearing is committed to this Court's discretion.

18   *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).  "In deciding whether to grant an evidentiary

19   hearing, a federal court must consider whether such a hearing could enable an applicant to prove

20   the petition's factual allegations, which, if true, would entitle the applicant to federal habeas

21   relief."  *Id.* at 474 (citations omitted).  "It follows that if the record refutes the applicant's factual

22   allegations or otherwise precludes habeas relief, a district court is not required to hold an

23   evidentiary hearing."  *Id.*  "[A]n evidentiary hearing is not required on issues that can be resolved

24

1   by reference to the state court record." *Id.* (citation and internal quotation marks omitted).

2   Applying this standard, the Court finds that an evidentiary hearing is not necessary to resolve the

3   issues raised by petitioner in grounds two through six.  The Court also recommends that no

4   certificate of appealability be granted as to grounds two through six, as petitioner has not made a

5   substantial showing of the denial of a constitutional right related to these grounds.

6           As to the first ground, for the reasons stated above, this Court recommends that the

7   District Judge conduct an evidentiary hearing.

8                                               **CONCLUSION**

9           The motions for consideration of extra-record evidence should be granted.  Dkts. 3, 19.

10  The District Court should set an evidentiary hearing regarding ground one of the habeas petition.

11  Grounds two through six of the petition should be denied and dismissed with prejudice, with no

12  certificate of appealability as to these grounds.

13          Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

14  fourteen (14) days from service of this Report to file written objections.  *See also* Fed. R. Civ. P.

15  6.  Failure to file objections will result in a waiver of those objections for purposes of *de novo*

16  review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a waiver of those

17  objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985); *Miranda v.*

18  *Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit

19  imposed by Fed. R. Civ. P. 72(b), the clerk is directed to set the matter for consideration on

20  December 31, 2021, as noted in the caption.

21          Dated this 10th day of December, 2021.

22

23                                              J. Richard Creatura

24                                              Chief United States Magistrate Judge